1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ALLSTATE INDEMNITY
COMPANY,

                    Plaintiff,

        v.

RANDY LINDQUIST, et al.,

                    Defendants.

CASE NO. C20-1508JLR

ORDER ON ALLSTATE'S
MOTION FOR PARTIAL
SUMMARY JUDGMENT

16

## I.      INTRODUCTION

17

18

19

20

21

22

Before the court is Plaintiff Allstate Indemnity Company's motion for partial

summary judgment on Defendant Randy Lindquist's bad faith and extra-contractual

counterclaims.  (Mot. (Dkt. # 204); Reply (Dkt. # 221).)  Mr. Lindquist opposes the

motion.  (Resp. (Dkt. # 217).)  The court has considered the parties' submissions, the

//

//

1  relevant portions of the record, and the applicable law.  Being fully advised,[1] the court

2  DENIES Allstate's motion for partial summary judgment.

3  ## II.  BACKGROUND

4  This case stems from a fire that burned down Mr. Lindquist's house at 6920 Fisher

5  Road in Edmonds, Washington (the "Fisher Road House") on December 25, 2019.

6  (Compl. (Dkt. # 1) ¶¶ 3.12.[2])  The Fisher Road House was insured by a homeowner's

7  insurance policy that Allstate issued in 2004 and renewed on an annual basis thereafter.

8  (*See* Argiannis Decl. (Dkt. # 72) ¶ 3, Ex. A (the "Policy"); *see also* 10/25/21 Ruiz Decl.

9  (Dkt. # 104) ¶ 2, Ex. A ("Grondahl Dep. Tr.") at 121:6-122:11.)  The Policy was sold by

10 Allstate agent and Third-Party Defendant in this action, Melody Grondahl.  (*See id.*)

11 Allstate learned about the fire from Ms. Grondahl, who contacted the company on

12 December 31, 2019 after seeing coverage of the fire on the local news and recognizing

13 the home as belonging to Mr. Lindquist.  (*See* Follett Decl. (Dkt. # 60) ¶ 8, Ex. A

14 ("Claim File Docs") at 2[3] (claim file documenting Ms. Grondahl's December 31, 2019

15 phone call to report that a "[f]ire of unknown origin" burned the Fisher Road House "to

16 the ground").)  Allstate sent a letter to Mr. Lindquist that same day to acknowledge that it

17 had opened a "claim and started working on it," and sent another letter on January 3,

18

19 [1] Neither party requests oral argument (*see* Mot. at 1; Resp. at 1) and the court concludes that oral argument is not necessary to its disposition of the motion, *see* Local Rules W.D. Wash.
20 LCR 7(b)(4).

21 [2] The court additionally incorporates by reference the summation of the factual background contained in its November 24, 2021 order.  (*See* 11/24/21 Order (Dkt. # 117) at 2-5.)

22 [3] The court uses the page numbers contained in the CM/ECF header when citing to the Claim File Docs.

1  2020 to "advise[]" Mr. Lindquist that his claim had been transferred to Brett Follett, an

2  employee in Allstate's special investigations unit ("SIU"), "for further investigation."

3  (*See* Wilhelm Decl. (Dkt. # 205) ¶ 5, Ex. C at 2-5;[4] *see also* Claim File Docs at 2-5

4  (documenting case file transfer to SIU).)  Mr. Follett asked Mr. Lindquist to "send

5  information concerning [the] loss" through a proof of loss form, which Mr. Follett

6  attached; "provide a detailed estimate of the damages sustained to the property,"

7  including personal property; and provide estimates of the cost to repair or replace the

8  damaged property.  (*See* Wilhelm Decl., Ex. C at 4.)  He did not explain to Mr. Lindquist

9  why the claim had been transferred to him.  (*See id.*)  The December 31, 2019 letter and

10  January 3, 2020 letter were sent by mail only to the Fisher Road House.  (*See id.* at 2, 4.)

11      By January 6, 2020, SIU had developed a plan for investigating coverage, which

12  included, among other steps, obtaining a recorded statement from Mr. Lindquist;

13  investigating the Fisher Road House's occupancy status; obtaining a proof of loss and

14  inventory list from Mr. Lindquist; retaining a cause and origin ("C&O") investigator and

15  a vendor to canvas Mr. Lindquist's neighbors; obtaining police call logs; and reviewing

16  documents from Mr. Lindquist's bankruptcy proceeding.  (*See* Claim File Docs at 5-6.)

17  SIU was investigating with an eye toward identifying "[p]ossible [j]udicial [e]stoppel

18  issues on [personal property] items," as well as occupancy-related "exclusions that might

19  apply."  (*See id.*)  SIU further recommended that Allstate consider obtaining coverage

20  //

21

22  _____

[4] The court uses the page numbers contained in the CM/ECF header when citing to exhibits attached to the Wilhelm Declaration.

1   counsel "for review and/or possible examination under oath as further information

2   develops."  (*See id.* at 6.)

3          Accordingly, Allstate retained Rory Leid as coverage counsel and, through Mr.

4   Leid, sent Mr. Lindquist letters on January 17, 2020, February 7, 2020, and February 12,

5   2020 requesting that he attend an examination under oath ("EOU") and produce

6   supporting documentation.  (*See* Claim File Docs at 8; *see also* 6/10/21 O'Neill Decl.

7   (Dkt. # 61) ¶¶ 3-5, Exs. 1-3.[5])  Allstate sent these letters by email and also by U.S. mail

8   to the Fisher Road House and to Mr. Lindquist's home in Lake Forest Park, Washington.

9   (*See id.*)  In mid-March 2020, the parties agreed on March 27, 2020 as a date for Mr.

10  Lindquist's EOU.  (*See* 6/10/22 O'Neill Decl. ¶ 6, Ex. 4; *see also* Wilhelm Decl. ¶ 14,

11  Ex. L.)  Mr. Lindquist failed to appear for an examination on that date (*see* 6/10/22

12  O'Neill Decl. ¶ 7, Ex. 5 at 1) but indicated by email on April 1, 2020 that he would be

13  available for an examination "anytime after the 13th of [A]pril 2020" (Wilhelm Decl.

14  ¶ 16, Ex. N; *see also* 6/10/22 O'Neill Decl. ¶ 8, Ex. 6 at 1 (April 2, 2020 letter from

15  Allstate agreeing to continue EOU and allowing Mr. Lindquist "until April 13, 2020 to

16  obtain legal counsel and . . . provide  a new date and time for" the EOU)).  To facilitate

17  his retention of counsel, Mr. Lindquist requested a certified copy of the Policy on April

18  13, 2020, which Allstate provided to him on April 27, 2020.  (*See* Claim File Docs at

19  17-18.)

20  //

21  _____

22      [5] The court uses the page numbers contained in the CM/ECF header when citing to the
    exhibits contained in the 6/10/22 O'Neill Declaration.

1    Allstate sent another letter on April 30, 2020 asking Mr. Lindquist to provide by

2  May 5, 2020 "either the name of [his] counsel or dates for [his] examination under oath"

3  and to provide by May 8, 2020 completed proof of loss and inventory forms.  (*See*

4  6/10/22 O'Neill Decl. ¶ 9, Ex. 7 at 1 (emphasis omitted).)  On May 6, 2020, Mr.

5  Lindquist indicated that he had not yet retained counsel and requested "a couple of

6  available dates from sometime after the middle to late [J]une to allow . . . time to do

7  inventory of the site."  (Wilhelm Decl. ¶ 17, Ex. O.)  Allstate sent another letter on May

8  26, 2020 and asked Mr. Lindquist to provide a completed proof of loss and inventory

9  form by June 8, 2020 and to attend an EOU on June 18, 2020.  (*See* 6/10/22 O'Neill Decl.

10  ¶ 10, Ex. 8 at 1.)  On June 8, 2020, Mr. Lindquist indicated that he would meet with his

11  counsel the following day and, accordingly, needed his EOU moved to the end of the

12  June or early July.  (*See* Wilhelm Decl. ¶ 18, Ex. P.)  Allstate agreed, by letter dated June

13  10, 2020, to "provide [Mr. Lindquist] with another opportunity to appear for [an]

14  examination under oath," and asked that he schedule the continued EOU by June 19,

15  2020.  (*See* 6/10/22 O'Neill Decl. ¶ 11, Ex. 9 at 1, 3.)

16    Mr. Lindquist's newly retained counsel responded on June 18, 2020 and indicated

17  that Mr. Lindquist's EOU could be set on "a near-term, mutually available date" (*see*

18  6/10/22 O'Neill Decl. ¶ 12, Ex. 10 at 1) but, in a subsequent July 7, 2020 letter, requested

19  that the EOU be continued until Allstate provided "further information" regarding

20  Allstate's instructions to Third-Party Defendant G&J Restoration, Inc., d/b/a Paul Davis

21  of Greater Seattle ("Paul Davis")—a contractor Allstate retained to clear debris from the

22  //

1   Fisher Road House property in the course of investigating the fire loss.  (*See* 6/10/22

2   O'Neill Decl. ¶ 13, Ex. 11 at 1-2.[6])

3          On August 13, 2020, Mr. Lindquist provided his proof of loss and inventory forms

4   to Allstate and also sat for his EOU.  (*See* 11/12/20 Leid Decl. (Dkt. # 9) ¶ 5, Ex. C

5   ("Lindquist EOU"); *see also* 3/10/22 Ruiz Decl. (Dkt. # 148) ¶ 17, Ex. 16 (claim file

6   entry showing receipt of completed proof of loss form on August 13, 2020); Howson

7   Decl. (Dkt. # 150) ¶ 5, Ex. D (proofs of loss); Howson Decl. ¶ 5, Ex. C (inventory).)

8   Following Mr. Lindquist's EOU, on September 16, 2020, Allstate requested additional

9   information from Mr. Lindquist regarding his non-salvage personal property inventory in

10  order to "price [his] damaged personal property more accurately."  (Wilhelm Decl. ¶ 10,

11  Ex. H.)

12         Allstate filed this declaratory judgment action on October 13, 2020 to determine

13  whether Mr. Lindquist "is entitled to coverage pursuant to the terms and conditions of the

14  Policy."  (*See* Compl. ¶ 4.2.)  Mr. Lindquist answered the complaint on December 29,

15  2020 and asserted counterclaims against Allstate for:  a determination of coverage

16  (Counterclaim No. 1); breach of contract (Counterclaim No. 2); violation of the insurer's

17  duty of good faith (Counterclaim No. 3); negligent claims handling (Counterclaim No. 4);

18  violations of the Washington Consumer Protection Act ("CPA") (Counterclaim No. 5);

19  an injunction under the CPA (Counterclaim No. 6); and violations of the Washington

20  //

21         [6] Mr. Lindquist alleges that Paul Davis, at Allstate's instruction, trespassed onto his
    property, caused further damage, and impeded his ability to conduct his own site inspection.
22  (*See* Answer (Dkt. # 27) ¶¶ 191-195.)

1    Insurance Fair Conduct Act ("IFCA") (Counterclaim No. 7).  (*See* Answer ¶¶ 133-169,

2    196-202).)  Mr. Lindquist also asserted a claim against Ms. Grondahl for ordinary

3    negligence (*id.* ¶¶ 170-190), and a claim for trespass, jointly, against Paul Davis and

4    Allstate (*see id.* ¶¶ 191-195).

5          Allstate previously moved for partial summary judgment as to its compliance with

6    provisions of the Washington Administrative Code ("WAC") and Mr. Lindquist's bad

7    faith claim.  (*See* 3/28/22 X-MSJ (Dkt. # 162) at 16-24.)  The court concluded that

8    Allstate did not violate WAC 284-30-330(5) or 284-30-380(1) and granted summary

9    judgment as to those regulatory violations, but found that factual questions remained as to

10   whether Allstate violated WAC 284-30-330(4) or 284-30-370.  (*See* 5/20/22 Order (Dkt.

11   # 207) at 28-33.)  In light of those factual disputes, the court further denied Allstate's

12   cross-motion for partial summary judgment on Mr. Lindquist's bad faith counterclaim.

13   (*See id.* at 34 (citing *Tank v. State Farm Fire & Cas. Co.*, 715 P.2d 1133, 1136 (Wash.

14   1986)).)

15         Allstate now moves for partial summary judgment on Mr. Lindquist's

16   Counterclaim Nos. 3-7, which includes counterclaims for bad faith, negligent claims

17   handling, violations of the CPA, and violations of IFCA.  (*See* Mot. at 9.[7])

18   //

19   //

20

21        [7] Mr. Lindquist's trespass claim against Allstate is also labeled as Counterclaim No. 6
     (*see* Answer at 24) but the court does not read Allstate's current motion for partial summary
     judgment to encompass that claim.  (*See generally* Mot.)  Accordingly, the court does not

22   consider whether summary judgment in Allstate's favor is warranted on that trespass claim.

# III.   ANALYSIS

After setting forth the legal standard that applies to Allstate's motion, the court considers Allstate's arguments for partial summary judgment on Mr. Lindquist's Counterclaim Nos. 3-7.

## A.   Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, either "party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56.  Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*  The moving party bears the initial burden of showing that there is no genuine dispute of material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party does not bear the ultimate burden of persuasion at trial, it nevertheless "has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or

1  show that the nonmoving party does not have enough evidence of an essential element to

2  carry its ultimate burden of persuasion at trial."  *Id.*  If the moving party meets its burden

3  of production, the burden then shifts to the nonmoving party to identify specific facts

4  from which a factfinder could reasonably find in the nonmoving party's favor.  *Celotex*,

5  477 U.S. at 324; *Anderson*, 477 U.S. at 250.

6  **B.     Allstate's Motion for Partial Summary Judgment**

7            Allstate argues that partial summary judgment should be granted in its favor on

8  each of Mr. Lindquist's "extracontractual claims . . . because [its] conduct in this matter

9  does not support a claim for bad faith, violations of the IFCA, violations of the CPA, or

10  negligent claims handling."  (*See* Mot. at 1-2; *see also id.* at 9 (arguing that summary

11  judgment is warranted on Mr. Lindquist's "counterclaims 3-7").)  Below, the court begins

12  by considering whether Allstate's motion is impermissibly repetitive of its earlier

13  cross-motion for partial summary judgment on the bad faith claim, before turning to

14  consider whether partial summary judgment in Allstate's favor is warranted for any of

15  Mr. Lindquist's extracontractual claims.

16            1.     Repetitive Summary Judgment Motions

17            As a threshold matter, Mr. Lindquist takes issue with the fact that this is the

18  second time Allstate has moved for summary judgment on his bad faith claim.  (*See*

19  Resp. at 11; *see also* 5/20/22 Order at 34 (denying summary judgment to Allstate on Mr.

20  Lindquist's bad faith claim).)  The court has discretion to entertain successive motions for

21  summary judgment if doing so "fosters the 'just, speedy, and inexpensive' resolution of

22  suits.'"  *Hoffman v. Tonnemacher*, 593 F.3d 908, 911 (9th Cir. 2010) (quoting Fed. R.

Civ. P. 1); *see also Kische USA LLC v. Simsek*, No. C16-0168JLR, 2017 WL 5881322, at

*3 (W.D. Wash. Nov. 29, 2017).  However, it "should 'weed out frivolous or simply

repetitive motions.'"  *Young v. Pena*, No. C18-1007JLR-MLP, 2019 WL 5064769, at *2

(W.D. Wash. Oct. 9, 2019) (quoting *Hoffman*, 593 F.3d at 911).  In deciding whether to

entertain a successive summary judgment motion, "a district court may consider the

following factors:  '(1) an intervening change in controlling law; (2) the availability of

new evidence or an expanded factual record; and (3) [the] need to correct a clear error or

prevent manifest injustice.'"  *Kische USA LLC*, 2017 WL 5881322, at *3 (internal

quotation marks omitted) (quoting *Brazill v. Cal. Northstate Coll. of Pharm., LLC*, No.

CIV. 2:12-1218 WBS GGH, 2013 WL 4500667, at *1 (E.D. Cal. Aug. 22, 2013)).

　　　　Allstate's motion is not frivolous but it is repetitive of its prior cross-motion for

partial summary judgment.  (*See* 3/28/22 X-MSJ at 16-24.)  Allstate does not argue that

the instant motion relies on a change in the controlling law, new factual developments, or

that it is needed to correct a clear error.  (*See generally* Mot.; Reply); *see also Kische

USA LLC*, 2017 WL 5881322, at *3.  Nor could it; Allstate filed this motion on May 17,

2022, while its cross-motion for partial summary judgment on Mr. Lindquist's bad faith

claim remained pending before the court.  (*See* 3/28/22 X-MSJ at 16-24; *see also* 5/20/22

Order.)  Allstate seems to argue that this motion is not repetitive of its earlier cross-

motion because, before cross-moving, it had notified Mr. Lindquist "that it intended to

cross move and asked the parties to stipulate to a briefing schedule."  (*See* Reply at 0

n.1.)  When Mr. Lindquist "refused to agree to a briefing schedule, . . . Allstate was

forced to cross move on the issues which [Mr.] Lindquist had already brought" and then

1   to file this subsequent motion in advance of the dispositive motions deadline.  (*See id.*)

2   Allstate is correct that "[p]arties anticipating filing cross motions are encouraged to agree

3   on a briefing schedule."  *See* Local Rules W.D. Wash. LCR 7(k).  But the failure of the

4   parties to do so in this case did not require Allstate to cross-move on Mr. Lindquist's bad

5   faith claim.  Allstate could have simply opposed Mr. Lindquist's motion at that time and

6   then later, within the time limits provided by the scheduling order, comprehensively

7   moved for partial summary judgment in its own favor on Mr. Lindquist's extra-

8   contractual claims.  (*See* Sched. Order (Dkt. # 30)); *see also* Fed. R. Civ. P. 56(b) ("[A]

9   party may file a motion for summary judgment at any time until 30 days after the close of

10  all discovery.").

11         That is enough reason to deny Allstate's motion.  However, whether Allstate

12  engaged in bad faith claims handling bears on the negligent claims handling, CPA, and

13  IFCA claims on which Allstate now moves for the first time.  In light of those

14  overlapping issues, consideration of Allstate's successive motion "fosters the 'just,

15  speedy, and inexpensive' resolution of suits.'"  *See Hoffman*, 593 F.3d at 911.  Although

16  the court considers this issue a second time, however, the result is the same because, as

17  explained below, "on the record before it, the court cannot determine the reasonableness

18  of Allstate's claim investigation as a matter of law," rendering partial summary judgment

19  inappropriate.  (5/20/22 Order at 30.)

20         2.      Bad Faith Claim (Counterclaim No. 3)

21         "Claims for insurer bad faith 'are analyzed applying the same principles as any

22  other tort:  duty, breach of that duty, and damages proximately caused by any breach of

1  duty.  In order to establish bad faith, an insured is required to show the breach was

2  unreasonable, frivolous, or unfounded.'"  *Naxos, LLC v. Am. Fam. Ins. Co.*, No.

3  C18-1287JLR, 2020 WL 777260, at *20 (W.D. Wash. Feb. 18, 2020) (quoting *St. Paul*

4  *Fire & Marine Ins. Co. v. Onvia, Inc.*, 196 P.3d 664, 668 (Wash. 2008); *see also Smith*

5  *v. Safeco Ins. Co.*, 78 P.3d 1274, 1277 (Wash. 2003) ("To succeed on a bad faith claim,

6  the policyholder must show the insurer's breach of the insurance contract was

7  unreasonable, frivolous, or unfounded."  (citing *Overton v. Consol. Ins. Co.,* 433, 38 P.3d

8  322 (2002)))).  An insurer engages in bad faith where it fails to "act[] with honesty, base[]

9  its decision on adequate information," or "overemphasize[s] its own interests."  *See*

10  *Aecon Bldgs., Inc. v. Zurich N. Am.*, 572 F. Supp. 2d 1227, 1235-36 (W.D. Wash. 2008)

11  (citing 1 Allan D. Windt, Insurance Claims & Disputes: Representation of Insurance

12  Companies and Insureds § 2.05, at 38 (3d ed. 1995)).  "Whether an insurer acted in bad

13  faith is a question of fact," which can be resolved on summary judgment "only if there

14  are no disputed material facts pertaining to the reasonableness of the insurer's conduct

15  under the circumstances, or the insurance company is entitled to prevail as a matter of

16  law on the facts construed most favorably to the nonmoving party."  *See Smith*, 78 P.3d at

17  1277 (first citing *Van Noy v. State Farm Mut. Auto. Ins. Co.*, 16 P.3d 574 (Wash. 2001);

18  and then citing *Indus. Indem. Co. of the NW, Inc. v. Kallevig*, 792 P.2d 520 (Wash.

19  1990)); *see also Aecon Bldgs., Inc.*, 572 F. Supp. 2d at 1234 ("Bad faith claims generally

20  raise fact issues preventing a determination on summary judgment.").

21  Allstate argues that there can be no dispute that it acted in good faith toward Mr.

22  Lindquist because it "immediately began investigating [the] loss"; any delays were

caused by difficulties scheduling Mr. Lindquist's EOU and the need to clear the Fisher

Road House site of dangerous debris before the C&O investigation could begin; and

because it had a reasonable basis for seeking declaratory relief to establish that no

coverage was owed.  (Mot. at 9, 12 (capitalization omitted).)  Allstate would, in effect,

have the court constrict its review of its claims handling to three events:  (1) attempting to

schedule Mr. Lindquist's EOU; (2) retaining Paul Davis to conduct demolition work that

was purportedly necessary for EFI Global to conduct a C&O investigation; and (3) filing

this declaratory judgment action to establish that it owes Mr. Lindquist no coverage.  (*See*

Mot. at 12, 14.)

Considering only those actions, Allstate presents a compelling case for the

reasonableness of its claims handling.  However, Mr. Lindquist argues—with support

from expert testimony—that Allstate's claims handling obligation in this case extended

beyond seeking to schedule an EOU and hiring Paul Davis, and that Allstate engaged in

bad faith with respect to those other obligations.  (*See* Resp. at 5-6, 14-16.)  Specifically,

Mr. Lindquist points to Allstate's purported failure to:  invite Mr. Lindquist to attend its

C&O investigation; seek Mr. Lindquist's permission before authorizing Paul Davis to

conduct demolition work on the Fisher Road House; provide Mr. Lindquist with a copy

of the C&O report or key investigation updates, such as when its investigator found no

evidence of ignitable fluids and did not conclude that the fire was the result of arson;

assist Mr. Lindquist in preparation of his claim forms, or discuss those forms with him

once he had completed them; provide a written explanation for its denial of the claim;

interview Mr. Lindquist's family members or girlfriend to understand whether Mr.

1   Lindquist had an alibi that would defeat their theory of arson; or interview Mr.

2   Lindquist's bankruptcy attorney to understand how his personal property valuation was

3   established in that proceeding.  (*See* Resp. at 14-15.)  Mr. Lindquist also faults Allstate

4   for sending his claim to SIU immediately; instructing its C&O investigator not to contact

5   Mr. Lindquist; and for generally handling his claim for the purpose of identifying a basis

6   to deny coverage, as opposed to provide coverage.  (*See id.*)  According to Mr.

7   Lindquist's claims handling expert, Thomas Lether, this conduct violated the standard of

8   care owed by Allstate to Mr. Lindquist because, among other reasons, it "indicates that

9   [Allstate] has been attempting to find a basis to deny coverage rather than find

10  coverage[.]"  (*See* Lether Decl. (Dkt. # 178) ¶ 2, Ex. A ("Lether Report") at 7-9

11  (providing examples of purportedly substandard conduct).)

12          Despite Mr. Lether's testimony, Allstate insists there is no factual dispute

13  regarding the reasonableness of its claims handling conduct because Mr. Lether's

14  testimony examines steps Allstate did not take, which is impermissibly

15  backward-looking, and because he bases his opinions "on incorrect factual and legal

16  presumptions."  (*See* Mot. at 13-15, 23.)  Thus, the court first considers whether steps

17  Allstate did not take in handling Mr. Lindquist's claim are relevant to its claims handling

18  analysis before turning to consider whether Mr. Lether's testimony that those missteps

19  deviated from industry standards creates a factual dispute sufficient to deny Allstate's

20  motion.

21          Relying on *GCG Associates LP v. American Casualty Company of Reading

22  Pennsylvania*, Allstate argues that, when considering the reasonableness of its claims

1   handling, the court should consider only the steps Allstate did take, not those it failed to

2   take in handling Mr. Lindquist's claim.  (*See* Mot. at 14 (citing *GCG Assocs. LP v. Am.*

3   *Cas. Co. of Reading Pa.*, No. C07-792BHS, 2008 WL 3542620 (W.D. Wash. Aug. 8,

4   2008)).)  Mr. Lindquist argues, in response, that "determining thoroughness necessarily

5   requires an inquiry into what an insurer should have done but failed to do."  (*See* Resp. at

6   14 (citing *Gamble v. State Farm Mut. Auto. Ins. Co.*, No. C19-5956 RJB, 2020 WL

7   6286816, at *3 (W.D. Wash. Oct. 27, 2020)).)  The court agrees with Mr. Lindquist but

8   also concludes that the parties' positions—and the cases on which they rely—rest on

9   largely semantic differences.

10      *GCG Associates LP* held that an insurer did not fail to reasonably investigate a

11  water damage-based claim where it inspected openings in the building's exterior that

12  were made by the insured's investigator but declined to make its own, more intrusive

13  openings because the insured asked it not to do so.  *See GCG Assocs. LP*, 2008 WL

14  3542620, at *2-3, *10.  The court acknowledged that "[a] more probing investigation

15  may have uncovered more information," but concluded that insurers are "not required to

16  undertake the most extensive investigation possible" to demonstrate good faith, only one

17  that is conducted "in a reasonable manner before determining coverage."  *See id.* at *10.

18  As such, an insured cannot defeat summary judgment simply by identifying something

19  "more [the insurer] *could have done* to investigate"; the insured must address—and the

20  court must focus on—"the sufficiency of the investigation that *actually occurred*."  *See*

21  *id.* (emphasis in original).

22  //

1    It is not inconsistent with *GCG Associates LP*'s guidance, however, for the court

2    to consider whether Allstate's failure to take certain steps in the course of handling Mr.

3    Lindquist's claim rendered its conduct unreasonable "[i]n light of the facts and

4    circumstances of th[e] case." *See id.* So long as the court interprets the facts with respect

5    to what would have been reasonable in that particular case, what an insurer did and did

6    not do in handling a claim are two sides of the same coin. *See id.* Indeed, courts

7    routinely consider whether insurers undertook all of the actions necessary to conduct a

8    reasonable investigation. *See, e.g.*, *Gamble*, 2020 WL 6286816, at *3 ("Important factors

9    to determine whether an investigation was reasonable include whether the investigation

10   was thorough and whether the insurer consulted qualified experts.").[8]

11   Allstate further argues that the court should not rely on Mr. Lether's opinion

12   testimony because it is "based on incorrect factual and legal presumptions," and because

13   he is not qualified to opine on "the way the C&O investigation proceeded." (*See* Mot. at

14   13-14, 23 (capitalization omitted).) Factually, Allstate asserts that Mr. Lether fails to

15   "consider[] or mention . . . the letters and emails sent and received by Mr. Lindquist."

16   (Mot. at 23.) But Mr. Lether does acknowledge the letters and emails sent by Allstate to

17

---

18   [8] Moreover, even if *GCG Associates LP* is properly read as Allstate urges, it is distinguishable because, unlike the insured in that case, there is no evidence that Mr. Lindquist

19   objected to the further investigative steps he now says were necessary for a reasonable investigation. *See GCG Assocs. LP*, 2008 WL 3542620, at *10 (noting that the insurer

20   "encountered reluctance" from its insured when it requested permission to conduct a more intrusive investigation). To the contrary, Mr. Lindquist's grievance is that Allstate did not engage with him at all, other than for purposes of scheduling his EOU. (*See* Resp. at 14-15.)

21   For all of these reasons, there is no reason for the court to ignore the myriad steps Allstate did not take when handling Mr. Lindquist's claim, which Mr. Lether says were necessary to meet

22   industry standards. (*See* Lether Report at 7-9.)

1   Mr. Lindquist, albeit briefly and indirectly.  (*See* Lether Report at 6 (asserting that

2   "nobody was communicating with [Mr. Lindquist] until Allstate's counsel, Rory Leid,

3   got involved").)  Thus, Allstate's objection is more properly directed at the significance

4   that Mr. Lether assigns those letters and emails when he evaluates the reasonableness of

5   Allstate's claims handling conduct, which is an argument about the persuasiveness of Mr.

6   Lether's testimony that is properly addressed to and resolved by the jury.  *See City of*

7   *Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (noting that the test

8   for admitting expert testimony "'is not the correctness of the expert's conclusions but the

9   soundness of his methodology,'" and "[c]hallenges that go to the weight of the evidence

10  are within the province of a fact finder, not a trial court judge" (quoting *Primiano v.*

11  *Cook*, 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010)); *see also Daubert*

12  *v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination,

13  presentation of contrary evidence, and careful instruction on the burden of proof are the

14  traditional and appropriate means of attacking shaky but admissible evidence.").

15      Allstate's objection to Mr. Lether's "legal presumptions"—i.e., that he "fails to set

16  forth the applicable standards of care"—similarly provides no basis to discount his

17  testimony at this stage.  (*See* Mot. at 23.)  At a minimum, Mr. Lether opines on at least

18  the standard of care requiring insurers to "look to provide coverage as opposed to looking

19  for grounds to deny coverage," the relevancy of which Allstate acknowledges.  (*See id.*);

20  *see also Aecon Bldgs., Inc.*, 572 F. Supp. 2d at 1235-36 (noting that insurer may "not

21  overemphasize its own interests").  Moreover, even if it were true that Mr. Lether testifies

22  only as to that standard of care—and his report plainly addresses other standards (*see,*

ORDER - 17

*e.g.*, Lether Report at 4 (testifying that the duty of good faith requires insurers to "conduct a reasonable investigation of the claim at its own expense" and to "not deny coverage based on speculation or conjecture"))—Allstate does not explain why the court should ignore Mr. Lether's testimony with respect to that standard (*see* Mot. at 23).

Allstate next quibbles with Mr. Lether's qualifications to opine on "the way the C&O investigation proceeded." (*Id.*) Allstate states this objection only briefly and has not moved to exclude Mr. Lether from testifying on the basis that he is not qualified. (*See generally* Dkt.) More to the point, Mr. Lether's testimony concerns the manner in which an insurer must interact with its insured, not the manner in which a C&O investigator should conduct its investigation. (*See, e.g.*, Lether Report at 5 ("Allstate failed to notify the insured of the [C&O] investigation by EFI and did not provide copies of the report [to Mr. Lindquist]."); *id.* ("I am aware of no industry standard or custom that allows an insurer to demolish property owned by its insured without the insured's consent.").) Thus, the court concludes for purposes of this motion that, based on Mr. Lether's knowledge and experience, he is able to offer relevant and reliable testimony regarding applicable insurer claims handling standards in Washington State. (*See id.* at 1-3 (describing Mr. Lether's background information and qualifications)); *see also United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) ("Before admitting expert testimony into evidence, the district court must perform a 'gatekeeping role' of ensuring that the testimony is both 'relevant' and 'reliable' under Federal Rule of Evidence 702." (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993))).

1    Finally, Allstate asserts that the court should not consider Mr. Lether's testimony

2  for purposes of this motion because he assumes that "Allstate has failed to make a

3  coverage determination even a year after the fire," which conflicts with cases establishing

4  that "the filing of a declaratory action is a denial of coverage."  (*See* Mot. at 24 (citing

5  *Berkshire Hathaway Homestate Ins. Co. v. SQI, Inc.*, 132 F. Supp. 3d 1275, 1293 (W.D.

6  Wash. 2015)); *see also* 5/20/22 Order at 33 (citing *Berkshire Hathaway Homestate Ins.*

7  *Co.*, 132 F. Supp. 3d at 1293).)  Mr. Lether does acknowledge that Allstate has,

8  throughout this litigation, taken "the position that it owed no coverage to [Mr.]

9  Lindquist."  (*See* Lether Report at 6.)  Regardless, even if his report contained an

10  erroneous statement of the sort Allstate describes, Allstate gives no reason for the court to

11  ignore the unaffected portions of his report.  (*See* Mot. at 24.)

12    Accordingly, the court concludes that it may properly consider Mr. Lether's

13  opinion testimony in deciding whether Allstate is entitled to partial summary judgment

14  on Mr. Lindquist's bad faith claim.  As described above, Mr. Lether identifies a number

15  of areas where Allstate purportedly fell short of its claims handling obligations because

16  it:  failed to sufficiently communicate with its insured; emphasized its own interests over

17  those of Mr. Lindquist's; or structured its investigation and denied Mr. Lindquist's claim

18  based on a speculative and conjectural theory of arson.  (*See* Lether Report at 7-9

19  (identifying examples "indicat[ing] that [Allstate] has been attempting to find a basis to

20  deny coverage rather than find coverage"); *see also* Resp. at 14-15.)  Allstate's claims

21  handling expert witness, Dannette K. Leonhardi, disagrees with Mr. Lether's conclusions

22  and opines that Allstate "endeavored to provide quality claim handling to meet industry

1   claim standards[.]"  (*See* Leonhardi Rebuttal Report (Dkt. # 153-1) at 6-7.)  Thus, the

2   court is presented with precisely the sort of disagreement between expert witnesses that

3   warrants denial of summary judgment in favor of submission of the disputed issues to the

4   jury.  *See City of Pomona*, 750 F.3d at 1049 ("Where two credible experts disagree, it is

5   the job of the fact finder, not the trial court, to determine which source is more credible

6   and reliable.").

7           Even setting aside Mr. Lether's testimony, however, the record contains evidence

8   from which a jury could reasonably conclude that Allstate quickly adopted the view that

9   Mr. Lindquist burned his house down based on conjecture and then pursued that theory,

10  as well as others that would allow it to deny coverage, to the exclusion of its obligation to

11  simultaneously determine what coverage might exist under the policy and without

12  adequately communicating with Mr. Lindquist about claim adjustment developments.

13  For instance, Mr. Lindquist points to the deposition testimony of Ms. Grondahl's

14  colleague, Tami Salts, who testified that, after seeing news coverage of the Fisher Road

15  House fire on December 26, 2019, she called Ms. Grondahl to share her view that Mr.

16  Lindquist may have committed arson based on nothing more than a "gut" feeling that "he

17  was into some shady stuff."  (*See* 6/6/22 Knudsen Decl. (Dkt. # 218) ¶ 5, Ex. D ("Salts

18  Dep. Tr.") at 74:1-24.)  A few days later, Allstate entered a note in the claim file

19  indicating that, for several reasons, there was "[e]vidence of an intentional act caused by

20  the insured."  (*See* Claim File Docs at 4; *see also id.* at 23 (stating that SIU was

21  "accepting referral due to loss amount/possible arson")).)  At the same time, Ms. Grondahl

22  was recommending treating Mr. Lindquist's claim as "a low-priority," and "do[ing] a

thorough investigation" but "not contact[ing]" Mr. Lindquist "due to the sensitivity of the

claim." (*See id.* at 4.)  Additionally, Mr. Follett testified that he "basically indicated" to

Allstate's C&O investigator, Mark Crowley, that he should not speak with Mr. Lindquist

because SIU would "be taking a statement from" him.  (*See* 4/22/22 O'Neill Decl. (Dkt.

# 182) ¶ 4, Ex. B ("Follett Dep. Tr.") at 83:17-24.)  Finally, neither the Snohomish

County Fire Marshal investigation nor Allstate's own C&O investigation determined that

the fire was caused by arson.  (*See* 4/22/22 O'Neill Decl. ¶ 5, Ex. C ("Fire Marshal

Report") at 259 (noting that "no actual cause for the fire was determined after the

examination" and that, according to tests conducted by Allstate's C&O investigator,

"ignitable liquids" were not detected); *see also* Crowley Decl. (Dkt. # 139-3) ¶ 6, Ex. 4

("Crowley Report") at 15[9] (summarizing conclusions about likely cause and origin of

fire); *see also id.* at 45 (forensic lab report indicating that samples collected by EFI

Global "did not contain measurable levels of ignitable liquids").)  Nevertheless, Allstate

has continued to press its arson theory as a basis for denying coverage to Mr. Lindquist.

(*See, e.g.*, Compl. ¶ 3.12 ("On information and belief, the cause of the fire was

intentional."); 3/28/22 X-MSJ ("Mr. Lindquist had a financial motive, and an opportunity

to intentionally burn the house down.").)

　　　　Construing these facts in Mr. Lindquist's favor, a fact finder could conclude that

Allstate breached its good faith obligation because it developed a speculative theory that

Mr. Lindquist burned down the Fisher Road House and pursued that theory to the

---

[9] The court uses the page numbers contained in the CM/ECF header when citing to Mr. Crowley's report and supporting attachments.

1   exclusion of its other claim adjusting efforts, thereby prioritizing its own interests in

2   avoiding coverage.  *See Aecon Bldgs., Inc.*, 572 F. Supp. 2d at 1235-36 (insurer may "not

3   overemphasize its own interests"); *see also Indus. Indem. Co. of the Nw.*, 792 P.2d at 526

4   ("[A]n insurer . . . may not deny coverage based on a supposed defense which a

5   reasonable investigation would have proved to be without merit."); *Safeco Ins. Co. of Am.*

6   *v. JMG Restaurants, Inc.*, 680 P.2d 409, 417 (Wash. Ct. App. 1984) (affirming trial

7   court's decision to not direct a verdict in favor of insurer where there was "controversy

8   throughout the record as to what steps [the insurer] did or did not take in the investigation

9   of the claim").

10         To be sure, there is evidence in the record that Allstate referred the claim to SIU,

11   diligently sought to schedule Mr. Lindquist's EOU and repeatedly accommodated his

12   rescheduling requests, retained Paul Davis to clear debris from the Fisher Road House

13   site, and later filed this lawsuit—effectively denying coverage—for legitimate reasons

14   that were separate from its arson theory.  (*See, e.g.*, Claim File Docs at 4 (listing

15   "combination indicators").)  A jury could thus find that Allstate operated in a reasonable

16   manner and demonstrated good faith.  (*See* 5/20/22 Order at 34 (denying Mr. Lindquist's

17   motion for partial summary judgment on his bad faith claim).)  But the jury would not be

18   obligated to do so.  Indeed, it would be free to "pick and choose what evidence it wishes

19   to believe" and may accept the evidence supporting Mr. Lindquist's narrative—that

20   Allstate's investigation was rooted in speculation and unduly focused on finding a basis

21   to deny coverage—and reject the evidence that supports Allstate.  *See JMG Restaurants,*

22   *Inc.*, 680 P.2d at 418 (sustaining verdict in favor of insured on extracontractual

counterclaim notwithstanding cross-cutting evidence that supported the insurer's theory

of arson).  Because the record, construed in Mr. Lindquist's favor, would support a jury's

conclusion that Allstate's claims handling conduct resulted in the "unreasonable,

frivolous, or unfounded" denial of Mr. Lindquist's claim, *Smith*, 78 P.3d at 1277,

Allstate's motion for partial summary judgment on the bad faith claim is DENIED.

     3.     Negligent Claims Handling (Counterclaim No. 4)

     Allstate contends that negligent claims handling is "a duplicative cause of action"

requiring "'essentially the same [analysis] as that of a claim of bad faith.'"  (Mot. at 23

(quoting *Cardenas v. Navigators Ins. Co.*, No. C11-5578RJB, 2011 WL 6300253, at *8

(W.D. Wash. Dec. 16, 2011)).)  It thus rests on the same arguments it makes in support of

partial summary judgment on the bad faith claim.  (*See id.*[10])  Accordingly, because the

court cannot conclude, as a matter of law, that Allstate complied with its good faith

obligation to its insured, *see supra* at 11-23, it likewise cannot conclude that Allstate was

not negligent in handling Mr. Lindquist's claim.  As such, Allstate's motion for partial

summary judgment on Mr. Lindquist's negligent claims handling claim is DENIED.

//

//

//

---

[10] Mr. Lindquist concedes that "the 'distinction between negligence and bad faith in this context is blurred'" under Washington law, but nevertheless insists that they represent distinct causes of action and that "juries should be instructed regarding both theories."  (Resp. at 6 (first quoting *Safeco Ins. Co. of Am. v. Butler*, 823 P.2d 499, 508 (Wash. 1992); and then citing *First State Ins. Co. v. Kemper Nat. Ins. Co.*, 971 P.2d 953 (Wash. 1999).)  The parties will have an opportunity to propose jury instructions in the course of trial but, for purposes of this motion, the court concludes that any differences between the applicable legal standards are immaterial.

1     <u>4.</u>    <u>CPA Violations and Injunctive Relief (Counterclaim Nos. 5 and 6)</u>

2     The CPA makes unlawful "[u]nfair methods of competition and unfair or

3 deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020.

4 To establish an unfair competition claim under the CPA, a plaintiff must show that (1) an

5 unfair or deceptive act or practice, (2) occurred in the course of trade or commerce,

6 (3) impacted the public interest, (4) injured the plaintiff's business or property, and (5)

7 was caused by the defendant. *See Hangman Ridge Training Stables, Inc. v. Safeco Title*

8 *Ins. Co.*, 719 P.2d 531, 533-34, 539 (Wash. 1986) ("[P]rivate CPA plaintiffs must

9 establish all five elements."). Allstate asks the court to "dismiss [Mr.] Lindquist's CPA

10 claim as a matter of law" because he "fails to allege any specific unfair or deceptive act";

11 "has failed to establish any injury to business or property"; and "further failed to establish

12 a causal link in this matter." (Mot. at 22.) Thus, Allstate challenges Mr. Lindquist's

13 CPA claim based on *Hangman Ridge* factors 1, 4, and 5. (*See id.*)

14     Mr. Lindquist alleges that Allstate violated applicable insurance industry standards

15 and WAC regulations, which caused him to incur investigation-related expenses and

16 denied him "payment . . . for all rights and benefits" owed under the Policy. (*See* Answer

17 ¶¶ 126-132.) He also alleges that "Allstate violated its duty of good faith." (*Id.* ¶ 145.)

18 The court previously declined to grant partial summary judgment in Allstate's favor on

19 its alleged violations of WAC 284-30-330(4) and 284-30-370, as well as its alleged

20 breach of its duty of good faith. (*See* 5/20/22 Order at 31-34; *see also supra* at 11-23. If

21 Mr. Lindquist prevails at trial on either issue, he will be able to establish a per se unfair

22 trade practice and, accordingly, the first *Hangman Ridge* factor. *See Williams v. Geico*

1    *Gen. Ins. Co.*, 497 F. Supp. 3d 977, 984 (W.D. Wash. 2020) (holding that "[a] single

2    violation of WAC 284-30-330 constitutes a violation of RCW 48.30.010," which "is a per

3    se unfair trade practice and satisfies the first element of the 5-part test for bringing a CPA

4    action"); *Indus. Indem. Co. of the Nw.*, 792 P.2d at 529; *Tank*, 715 P.2d at 1140 ("It is

5    also established that breach of an insurer's duty of good faith constitutes a per se CPA

6    violation.").

7        Moreover, Allstate is incorrect that Mr. Lindquist "has failed to establish any

8    injury to business or property" or to "establish a causal link in this matter." (Mot. at 22.)

9    In its reply, Allstate argues that Mr. Lindquist cannot show injury because it "almost

10   immediately set loss reserves for the structure claim at the full policy limits, in

11   recognition of the extensive damage to the home." (Reply at 6 (citing Wilhelm Decl.

12   ¶ 13, Ex. K (claim file note indicating that, on January 3, 2020, Allstate set a $3,311,872

13   reserve amount for damage to the Fisher Road House structure)).) Allstate cites no case

14   law supporting the argument it appears to make that setting loss reserves, as opposed to

15   paying claim benefits, insulates it from liability under the CPA. (*See id.*) Nor does

16   Allstate point to any evidence showing that it reserved funds to cover the personal

17   property losses Mr. Lindquist claims. (*See id.*) Regardless, it is undisputed that, to date,

18   Allstate has not paid Mr. Lindquist any of his contracted-for insurance benefits, which is

19   sufficient to establish an injury to business or property within the meaning of the CPA

20   and one which was caused by Mr. Lindquist's insurer, Allstate. *See Peoples v. United*

21   *Servs. Auto. Ass'n*, 452 P.3d 1218, 1222 (Wash. 2019) (concluding "that the deprivation

22   //

of contracted-for insurance benefits is an injury to 'business or property' regardless of the type of benefits secured by the policy").

Accordingly, Allstate's motion for partial summary judgment on Mr. Lindquist's CPA claim is DENIED.  Because the court cannot yet determine liability, Allstate's motion for partial summary judgment is also DENIED with respect to Mr. Lindquist's claim for injunctive relief under the CPA.

5.    IFCA Violations (Counterclaim No. 7)

RCW 48.30.015 provides that a "first party claimant to a policy of insurance who is unreasonably denied a claim for coverage or payment of benefits by an insurer may bring an action . . . to recover the actual damages sustained, together with the costs of the action, including reasonable attorneys' fees and litigation costs[.]"  *Perez-Crisantos v. State Farm Fire & Cas. Co.*, 389 P.3d 476, 479 (Wash. 2017).  Unlike bad faith and CPA claims, a regulatory violation, on its own, is not enough to sustain a claim under IFCA. *See id.* at 483 (concluding "that IFCA does not create an independent cause of action for regulatory violations").  Here, both parties repeat the arguments they made with respect to the bad faith issue.  (*See* Mot. at 22 (arguing that Mr. Lindquist's IFCA claim fails as a matter of law because Mr. Lindquist "has failed to establish[] Allstate's conduct was frivolous, unfounded, or unreasonable"); *see also* Resp. at 16 (arguing that whether Allstate unreasonably denied his claim turns on disputed issues of fact).)

As discussed above, the record contains disputed facts which, when viewed in the light most favorable to Mr. Lindquist, would allow a jury to conclude that Allstate acted unreasonably in the course of handling Mr. Lindquist's claim.  *See supra* at 11-23.  Those

1    facts must be resolved at trial and, accordingly, Allstate's motion for partial summary

2    judgment on Mr. Lindquist's IFCA claim is DENIED.

3                                    **IV.    CONCLUSION**

4              For the foregoing reasons, Allstate's motion for partial summary judgment on Mr.

5    Lindquist's bad faith, negligent claims handling, CPA, and IFCA claims (Dkt. # 204) is

6    DENIED.

7              Dated this 30th day of June, 2022.

8

9                                                _____

10                                               JAMES L. ROBART
                                                 United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

ORDER - 27